IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JAMES FILSON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) No. 06 C 3839 |
| v. | ) |
| | ) |
| THE BIG TEN CONFERENCE and | ) |
| JIM DELANY, | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

Plaintiff James Filson filed the present three-count Complaint alleging violations under Title I (Count I), or in the alternative, Title III (Count II) of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12131 *et seq.*, against his former employer the Defendant Big Ten Conference ("Big Ten") and his former supervisor, Defendant Jim Delany ("Delany"), who is the Big Ten's Commissioner. Filson also alleges a state law claim of intentional interference with prospective economic advantage against Delany (Count III). Before the Court is Defendants' Motion to Dismiss Counts II and III of the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). For the following reasons, the Court grants in part and denies in part Defendants' motion.

## LEGAL STANDARDS

A motion to dismiss pursuant to Rule 12(b)(6) tests the legal sufficiency of a complaint, not the merits of the case. *Triad Assocs., Inc. v. Chicago Hous. Auth.*, 892 F.2d 583, 586 (7th Cir. 1989); *see also Cler v. Illinois Educ. Ass'n,* 423 F.3d 726, 729 (7th Cir. 2005). The Court will only grant a motion to dismiss if "it appears beyond doubt that the plaintiff can prove no set of

facts in support of his claim which would entitle him to relief." *Centers v. Centennial Mortgage, Inc.*, 398 F.3d 930, 933 (7th Cir. 2005) (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S. Ct. 99, 2 L.Ed.2d 80 (1957)). The Court must assume the truth of the facts alleged in the pleadings, construe the allegations liberally, and view them in the light most favorable to the plaintiff. *Centers*, 398 F.3d at 933.

## BACKGROUND

From 1992 until 2004, Filson officiated Big Ten football. (R. 1-1 Compl. ¶ 7.) In 2000, Filson lost his right eye in an accident and elected to have it removed and a prosthesis put in place. (*Id*. ¶ 9.) Prior to having eye surgery, Filson contacted his immediate supervisor, David Parry, the Big Ten's Coordinator of Football Officials, and told him about the accident and his resulting condition. (*Id*. ¶ 10.) Parry responded by telling Filson that he expected him to work hard at recovery and be able to return for the upcoming football season. (*Id*.) After his surgery, Filson investigated whether he could continue officiating and also sought advice from doctors and surgeons. (*Id*. ¶ 11.) Based on this advice and his doctor's release, Filson returned to officiating in the Fall of 2000 with Parry's approval. (*Id*. ¶¶ 11, 12, 14.)

After his accident and return to officiating, Filson was very honest about his eye condition and spoke openly about it. (*Id*. ¶ 15.) Meanwhile, after returning for the 2000 football season, Filson officiated the next five seasons without incident. (*Id*. ¶ 16.) During those five years, Filson's performance reviews were, on average, substantially better than his reviews in the eight years preceding the loss of his eye. (*Id*.) In fact, Filson performed so well that he was chosen to officiate two bowl games during those five years, including the Orange Bowl, which is an honor bestowed upon the highest rated officials in the Big Ten. (*Id*.)

2

In the Spring of 2005, a reporter contacted Lloyd Carr, the head football coach of the University of Michigan, and told him that Filson was officiating with one eye. (*Id.* ¶ 17.) Carr then contacted Defendant Delany. (*Id.*) Thereafter, without first asking Filson about his condition or subjecting him to vision or performance assessments, Delany instructed Parry to terminate Filson's employment, which Parry did on May 3, 2005. (*Id.* ¶¶ 18, 19.) Parry explained to Filson that Delany did not want to deal with the backlash of the Big Ten public knowing about Filson's condition and thought that he would have "hell to pay" if the public found out about it. (*Id.* ¶ 20.)

## ANALYSIS

I. **Title III of the ADA – Count II**

In his Complaint, Filson brings a claim under Title I of the ADA, which governs employment practices. Defendants are not seeking to dismiss this claim. Filson, however, also alleges an employment discrimination claim under Title III of the ADA, which concerns public accommodations. Defendants move to dismiss this claim arguing that Title III does not apply to work-related disability discrimination claims. The Court agrees.

A. **Purpose of the ADA**

"Congress enacted the ADA to ensure that individuals with disabilities fully enjoy the goods, services, privileges, and advantages available indiscriminately to other members of the general public." *Olinger v. U.S. Golf Ass'n,* 205 F.3d 1001, 1004 (7th Cir. 2000), *rev'd on other grounds*, 532 U.S. 1064, 121 S.Ct. 2212, 150 L.Ed.2d 207 (2001); *see also Wisconsin Cmty. Servs., Inc. v. City of Milwaukee,* 465 F.3d 737, 750 (7th Cir. 2006) (ADA designed "to provide a clear and comprehensive national mandate for the elimination of discrimination against

individuals with disabilities") (citing 42 U.S.C. § 12101(b)(1), (b)(4)). "The ADA's mandate extends to three broad, yet distinct, areas: employment (Title I), public services (Title II), and places of public accommodation (Title III)." *Olinger,* 205 F.3d at 1004; *see also PGA Tour, Inc. v. Martin,* 532 U.S. 661, 675, 121 S.Ct. 1879, 149 L.Ed.2d 904 (2001).

**B.     Statutory Language**

To ascertain whether Filson can bring his employment discrimination claim against Defendants under Title III of the ADA, the Court must first look to the specific language of the ADA to determine its legislative purpose. *Northcutt v. General Motors Hourly-Rate Employees Pension Plan,* 467 F.3d 1031, 1035 (7th Cir. 2006); *see also McMillan v. Collection Prof'ls, Inc.,* 455 F.3d 754, 762 (7th Cir. 2006) (statute itself is most reliable indicator of congressional intent). More specifically, in "a statutory construction case, the beginning point must be the language of the statute, and when a statute speaks with clarity to an issue judicial inquiry into the statute's meaning, in all but the most extraordinary circumstances, is finished." *Estate of Cowart v. Nicklos Drilling Co.,* 505 U.S. 469, 475, 112 S.Ct. 2589, 120 L.Ed.2d 379 (1992). A cardinal principle of statutory construction is to construe statutes in the context of the entire statutory scheme to avoid rendering certain statutory provisions superfluous or insignificant. *See Duncan v. Walker,* 533 U.S. 167, 174, 121 S.Ct. 2120, 150 L.Ed.2d 251 (2001).

Title III, entitled Public Accommodations and Services Operated by Private Entities, forbids discriminating against disabled people concerning access to places of public accommodation with the goal of giving disabled people equal access to the sellers of goods and services. *Morgan v. Joint Admin. Bd.*, 268 F.3d 456, 459 (7th Cir. 2001). Specifically, Title III states:

4

> No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation.

42 U.S.C. § 12182(a). "The core meaning of this provision, plainly enough, is that the owner or operator of a store, hotel, restaurant, dentist's office, travel agency, theater, Web site, or other facility (whether in physical space or in electronic space), that is open to the public cannot exclude disabled persons from entering the facility and, once in, from using the facility in the same way that the nondisabled do." *Doe v. Mutual of Omaha Ins. Co.,* 179 F.3d 557, 558-59 (7th Cir. 1999) (internal citation omitted).

On the other hand, Title I of the ADA, entitled Employment, protects qualified individuals with disabilities from discrimination in their employment. *Rooney v. Koch Air, LLC,* 410 F.3d 376, 380 (7th Cir. 2005); *see also Karraker v. Rent-A-Center, Inc.,* 411 F.3d 831, 835 (7th Cir. 2005) (Title I "is devoted to eliminating employment discrimination based on actual or perceived disabilities"). Title I provides:

> No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

42 U.S.C. § 12112(a). Thus, by its clear terms, Title I specifically applies to the conditions and terms of employment, whereas Title III does not. As the canons of statutory construction dictate, specific provisions of a statute must prevail over more general provisions. *See Harrell v. U.S. Postal Serv.,* 445 F.3d 913, 927 (7th Cir. 2006). Further, if the Court were to interpret Title III as encompassing employment discrimination claims, many of Title I's provisions would become superfluous or redundant. *See Duncan,* 533 U.S. at 174. Meanwhile, the Seventh Circuit has

articulated that the core meaning of Title III is that an "owner or operator of a store, hotel, restaurant, dentist's office, travel agency, theater, Web site, or other facility... open to the public cannot exclude disabled persons from entering the facility and, once in, from using the facility in the same way that the nondisabled do." *Mutual of Omaha Ins. Co.,* 179 F.3d at 558-59 (internal citation omitted). In short, Title III does not cover disability claims in the context of employment discrimination.

Indeed, the Sixth Circuit directly addressed the differences between Title III and Title I and concluded that "the statutory framework of the ADA expressly limits discrimination in employment practices to Title I of the ADA." *Parker v. Metropolitan Life Ins. Co.,* 121 F.3d 1006, 1014 (6th Cir. 1997) (en banc); *see also Clark v. City of Chicago*, No. 97 C 4820, 2000 WL 875422, *6 (N.D. Ill. June 28, 2000) ("the ADA clearly expresses Congress' intent that employment claims be governed exclusively by Title I"). The *Parker* court thus found no need to examine the Act's legislative history. *Parker,* 121 F.3d at 1014 n.10.

### C. Legislative History

Although the Court need not examine the legislative history of the ADA because the plain language of the statute reflects Congress' intent that claims regarding the terms and conditions of employment are governed under Title I, the legislative history further supports the Court's conclusion. *See United States v. Logan,* 453 F.3d 804, 805-06 (7th Cir. 2006) (courts need only examine legislative history to resolve ambiguities in the statutory language). Specifically, the ADA's legislative history reveals that Congress intended for Title I to follow Title VII of the Civil Rights Act of 1964 in many respects. *Baumgardner v. County of Cook,* 108 F.Supp.2d 1041, 1044 (N.D. Ill. 2000). "The ADA provides many of the same rights to

individuals with disabilities that have been available to others because of their race, national origin, sex, and age through earlier civil rights laws." *Id.* (quoting 136 CONG. REC. 10858 (1990) (statement of Rep. Bartlett) reprinted in LEGISLATIVE HISTORY OF Public Law 101-336, the Americans With Disabilities Act at 621 (Comm.Print.1991)). Title I, for example, expressly incorporates the powers, remedies, and procedures set forth in Title VII. *See Stepney v. Naperville Sch. Dist.,* 392 F.3d 236, 239 (7th Cir. 2004) (citing 42 U.S.C. § 12117(a)).

Moreover, the ADA's legislative history specifically indicates that Congress intended to regulate employment disability discrimination through Title I, notwithstanding Title III's broad language. *See Menkowitz v. Pottstown Mem'l Med. Ctr.,* 154 F.3d 113, 118-19 (3d Cir. 1998); *see also Ford v. Schring-Plough Corp.,* 145 F.3d 601, 612 (3d Cir. 1998) ("Terms and conditions of employment are covered under Title I, not Title III."). The *Menkowitz* court specially relied upon the following language from the relevant Senate Report – "Title III is not intended to govern any terms or conditions of employment by providers of public accommodations or potential places of employment; employment practices are governed by [T]itle I of this legislation." *Id.* at 319 (quoting S.Rep. No. 101-116, at 58 (1989); H.R.Rep. No. 101-485, pt. 2, at 99 (1990), reprinted in 1990 U.S.C.C.A.N. 303, 382).

### D. Conclusion

Despite Congress' clear intention that Title III does not govern disability discrimination in the context of employment, Filson sets forth a convoluted examination of the ADA's language and legislative history to reach the opposite conclusion. Filson, however, does not and cannot reconcile his interpretation with the plain language of the statute or the unequivocal language in the Senate Report that "Title III is not intended to govern any terms or conditions of employment

7

by providers of public accommodations or potential places of employment." *See* S.Rep. No. 101-116, at 58 (1989); H.R.Rep. No. 101-485, pt. 2, at 99 (1990), reprinted in 1990 U.S.C.C.A.N. 303, 382. In sum, the ADA's text and legislative history make clear that Congress did not intend for Title III to govern employment discrimination claims. Accordingly, Filson's attempt to bring his employment discrimination claim under Title III of the ADA fails. The Court thus grants Defendants' Motion to Dismiss Count II of the Complaint.

## II.     Tortious Interference with Prospective Economic Advantage – Count III

In Count III of his Complaint, Filson alleges a claim of tortious interference with prospective economic advantage against Delany. Under Illinois law, the elements of tortious interference with prospective economic advantage include: (1) plaintiff's reasonable expectation of entering into a valid business relationship; (2) defendant's knowledge of this expectation; (3) defendant's purposeful interference with plaintiff's legitimate expectation; and (4) damages. *Cody v. Harris,* 409 F.3d 853, 859 (7th Cir. 2005) (citing *Fellhauer v. City of Geneva,* 142 Ill.2d 495, 154 Ill.Dec. 649, 568 N.E.2d 870, 878 (1991)). Here, Defendants contend that Filson has failed to state a claim of tortious interference because he did not allege that Delany's tortious actions were directed at a third party. *See Adams v. Catrambone,* 359 F.3d 858, 865 (7th Cir. 2004) ("[T]he tort of interference with prospective advantage requires a showing of action by the defendant toward a third party.") (quoting *Vickers v. Abbott Labs.,* 308 Ill.App.3d 393, 241 Ill.Dec. 698, 719 N.E.2d 1101, 1116 (1999)).

Contrary to Defendants' argument, Filson is not required to allege any factual or legal elements of his claim to survive a motion to dismiss under Rule 12(b)(6). *See Simpson v. Nickel,* 450 F.3d 303, 304 (7th Cir. 2006). Indeed, under the liberal federal notice pleading standards, a

8

complaint need only include "a short and plain statement of the claim showing that the pleader is entitled to relief" giving "the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Swierkiewicz v. Sorema N. A.,* 534 U.S. 506, 507, 122 S.Ct. 992, 995, 152 L.Ed.2d 1 (2002) (quoting *Conley v. Gibson*, 355 U.S. at 47); *see also* Fed.R.Civ.P. 8(a)(2). In other words, "[i]t is enough to name the plaintiff and the defendant, state the nature of the grievance, and give a few tidbits (such as the date) that will let the defendant investigate." *Kolupa v. Roselle Park Dist.*, 438 F.3d 713, 714 (7th Cir. 2006). As the *Kolupa* decision made clear "'[a]ny district judge (for that matter, any defendant) tempted to write 'this complaint is deficient because it does not contain...' should stop and think: What rule of law *requires* a complaint to contain that allegation?'" *Id*. (quoting *Doe v. Smith*, 429 F.3d 706, 708 (7th Cir. 2005)) (emphasis in original). "Any decision declaring 'this complaint is deficient because it does not allege X' is a candidate for summary reversal, unless X is on the list in Fed. R. Civ. P. 9(b)." *Id*. at 715. Tortious interference with economic advantage does not fall under Rule 9(b). *See* Fed. R. Civ. P. 9(b) ("In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity.")

Despite the Seventh Circuit's clear direction regarding the liberal notice pleading standards, Defendants point to a handful of district court cases in which the courts concluded that a plaintiff must specifically allege that the defendant directed a third party not to enter into or continue a contractual relationship in order to state a claim of tortious interference of economic advantage. *See, e.g.*, *Mercury Skyline Yacht Charters v. Dave Matthews Band, Inc.,* No. 05 C 1698, 2005 WL 3159680, at *9 (N.D. Ill. Nov. 22, 2005); *Premier Transport, Ltd. v. Nextel Comm'ns, Inc.*, No. 02 C 4536, 2002 WL 31507167, at *2 (N.D. Ill. Nov. 12, 2002). In these

9

non-binding cases, however, the district judges did not discuss the liberal notice pleading requirements under Federal Rule of Civil Procedure 8(a)(2). Instead, the courts relied on Illinois procedural rules although the Federal Rules of Civil Procedure govern diversity actions and state law claims brought in federal court through supplemental jurisdiction. *See Fidelity Nat. Title Ins. Co. of New York v. Intercounty Nat. Title Ins. Co.,* 412 F.3d 745, 750 (7th Cir. 2005); *Houben v. Telular Corp.,* 309 F.3d 1028, 1032-36 (7th Cir. 2002). Accordingly, the Court declines to follow the district court decisions that require a plaintiff to allege that a defendant directed a third party not to enter into or continue with a prospective contractual relationship with the plaintiff. *See FutureSource, LLC v. Reuters Ltd.*, 312 F.3d 281, 283 (7th Cir. 2002) ("The reasoning of district judges is of course entitled to respect, but the decision of a district judge cannot be a controlling precedent.").

Moreover, viewing the facts as alleged in a light most favorable to Filson, he has met the liberal notice pleading standards by properly alleging a claim of tortious interference with prospective economic advantage against Delany. *See Kolupa*, 438 F.3d at 714. Specifically, Filson alleges that he had a reasonable expectation of continuing his employment and/or business relationship with the Big Ten; Delany knew of this expectation, yet intentionally interfered with Filson's employment and business relationship with the Big Ten; and this interference caused Filson to suffer damages. (Compl. ¶¶ 34-38.) As such, Filson has given Delany fair notice of his claim and the grounds upon which it rests. *See Conley v. Gibson*, 355 U.S. at 47. Therefore, the Court denies Defendants' Motion to Dismiss Count III of the Complaint.

## CONCLUSION

For these reasons, the Court grants Defendants' Motion to Dismiss Count II of the Complaint, but denies Defendants' Motion to Dismiss Count III of the Complaint.

Dated: December 11, 2006

                        **ENTERED**

                        _____
                        **AMY J. ST. EVE**
                        **United States District Court Judge**